## ALBERT JANUSAUSKAS *v.* RICHARD A. FICHMAN
### (AC 19521)

Foti, Mihalakos and Healey, Js.

Argued October 17, 2000—officially released March 19, 2002

*Edward F. Hennessey,* for the appellant (plaintiff).

*Kerry R. Callahan,* with whom was *Barbara A. Frederick,* for the appellee (defendant).

*Opinion*

MIHALAKOS, J. The plaintiff, Albert Janusauskas, appeals from the judgment rendered for the defendant, Richard A. Fichman, after the trial court denied the plaintiff's motion to set aside the verdict and for a new trial. Specifically, the plaintiff claims that the court improperly (1) directed a verdict for the defendant on the plaintiff's breach of contract claim, (2) directed a verdict for the defendant on the plaintiff's claim under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., (3) denied the plaintiff the right to cross-examine the defendant's expert witness and (4) charged the jury on the issues of negligence and lack of informed consent. We reverse the judgment of the trial court in part and affirm it in part.

The following facts and procedural history are relevant to our resolution of this appeal. The plaintiff filed an amended eight count complaint dated July 23, 1997, against the defendant, who is an ophthalmologist. The plaintiff subsequently withdrew five of the eight counts, leaving only the first count (medical malpractice/lack of informed consent), fourth count (breach of contractual warranty) and the seventh count (violation of CUTPA). The case proceeded to trial and, after the completion of the plaintiff's case, the defendant filed a motion for a directed verdict as to the fourth and seventh counts. At the close of the evidence, the court directed the jury to return a verdict in favor of the defendant on counts four and seven of the revised complaint. As directed,

the jury returned a verdict for the defendant on counts four and seven. The jury also found for the defendant with regard to count one and awarded no damages to the plaintiff. The plaintiff then filed this appeal.

The jury reasonably could have found the following facts. In 1993, the plaintiff, who was fifty years old, first consulted the defendant concerning his severe myopia.[1] Since grade school, the condition required the plaintiff to wear glasses with corrective lenses. Sometime in the 1980s, the plaintiff learned of a procedure called radial keratotomy (RK), the purpose of which is to reduce nearsightedness. The plaintiff consulted with several ophthalmologists to determine if the procedure would correct his nearsightedness so that he would no longer need to wear corrective glasses or contact lenses. Each physician told the plaintiff that his myopia was so great that he would not benefit from RK.

In 1991 or 1992, the defendant attended a two day seminar conducted by John Casebeer, a physician. The seminar included the sale of medical instruments and a marketing system for the creation of a profitable RK practice. After attending the seminar, the defendant began performing RK surgery and implementing the marketing plan. The defendant advertised on radio and ran more than 260 print ads between January and May, 1993. The defendant was performing up to thirty-five RK procedures a day at a cost of $1500 per surgery, with a $200 discount when patients paid in cash.

The plaintiff either read or heard one of the defendant's ads claiming that RK could cure nearsightedness. As a result, the plaintiff visited the defendant's place of business and read his brochure, which stated, among other things, that the defendant was one of the nation's leaders in the field of RK.

---

[1] At various times throughout the trial, myopia was described as nearsightedness.

The plaintiff told the defendant that his goal was to be able to see without the aid of glasses or contact lenses, and that other physicians had told him that he could not achieve that through RK. The defendant told the plaintiff that new procedures existed and that he had successfully operated on patients with myopia as severe as the plaintiff's. The defendant also told the plaintiff that he could achieve 20/40 or 20/50 vision, uncorrected, in his left eye and 20/20 vision, uncorrected, in his right eye. In reality, the defendant followed a chart obtained from the original seminar he attended, which told him how much improvement could be obtained depending on a patient's eyesight. The actual effect of the procedure, as laid out in the chart and according to prevailing opinion in the medical community at the time, was that no improvement in eyesight would be gained by the plaintiff through the RK procedure. The defendant further told the plaintiff that he, the defendant, was the "best in the business."

The defendant performed RK surgery on the plaintiff in May, 1993. Following the surgery, the plaintiff's myopia grew worse and his vision became subject to glare during the day and at night. The plaintiff's near vision also became blurred. When the plaintiff asked the defendant if he would achieve his vision goal, the defendant told him that a further enhancement would be required. The defendant performed an enhancement procedure on the plaintiff's eyes in September, 1993. The plaintiff experienced no improvement.

The defendant continued to treat the plaintiff through most of 1995, reassuring him that he needed to be patient and allow his eyes to heal to achieve his eyesight goal. In early 1996, the plaintiff saw Girard Nolan, an ophthalmologist, who advised him that he should not have had the RK surgery. Nolan testified at a 1997 deposition that he would not have performed RK surgery

on the plaintiff and that the best outcome attainable for the plaintiff in 1993 was a lack of improvement.

The plaintiff later sought a medical opinion regarding his condition from Phillip Shelton, another ophthalmologist, who testified that the chances of the plaintiff achieving his vision goal as a result of the RK performed by the defendant were virtually nonexistent.

Our standard of review concerning directed verdicts is well settled. "Directed verdicts are historically not favored . . . . A trial court should direct a verdict for a defendant if, viewing the evidence in the light most favorable to the plaintiff, a jury could not reasonably and legally reach any other conclusion than that the defendant is entitled to prevail. . . . In assessing the evidence, the court should weigh both direct and circumstantial evidence, including all reasonable inferences to be drawn therefrom." (Citations omitted; internal quotation marks omitted.) *Kriz* v. *Coldwell Banker Real Estate*, 67 Conn. App. 688, 692, 789 A.2d 1091 (2002).

I

The plaintiff's first claim is that the court improperly directed a verdict for the defendant with regard to count four of the plaintiff's complaint, which alleged a contract claim based on the breach of a promise, warranty or guaranty. We agree.

"A breach of contract claim is a distinct claim that may arise from the same facts and may exist where the physician and patient contract for a specific result." *Rumbin* v. *Baez*, 52 Conn. App. 487, 491, 727 A.2d 744 (1999). "A true implied contract can only exist where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words. . . . It is not fatal to a finding of an implied contract that there were no express manifestations of

mutual assent if the parties, by their conduct, recognized the existence of contractual obligations." (Citation omitted; internal quotation marks omitted.) *Sandella* v. *Dick Corp.*, 53 Conn. App. 213, 219, 729 A.2d 813, cert. denied, 249 Conn. 926, 733 A.2d 849 (1999).

An implied "contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties. . . . In order to support contractual liability, the [defendant's] representations must be sufficiently definite to manifest a present intention on the part of the [defendant] to undertake immediate contractual obligations to the plaintiff." (Citations omitted; internal quotation marks omitted.) *Burnham* v. *Karl & Gelb, P.C.*, 50 Conn. App. 385, 389, 717 A.2d 811 (1998), aff'd, 252 Conn. 153, 745 A.2d 178 (2000).

The defendant told the plaintiff that through RK he could get the plaintiff's eyesight to 20/40 or 20/50, uncorrected, in his left eye and 20/20, uncorrected, in his right eye. Prevailing medical opinion at the time and the defendant's own surgical guidelines did not allow for that level of improvement, given the plaintiff's eyesight at that time and the state of RK technology. The plaintiff paid the defendant, underwent the procedure and experienced a worsening of his vision rather than an improvement. Following RK surgery, the plaintiff suffered glare during the day and at night, and his near vision became blurred.

When the plaintiff found that his eyesight was worse after RK, the defendant told him that a further enhancement would achieve the desired result of 20/50 or 20/40 vision, uncorrected, in his left eye and 20/20 vision, uncorrected, in his right eye. The plaintiff underwent an enhancement procedure performed by the defendant. The plaintiff experienced no improvement in his vision.

There was no express contract between the defendant and the plaintiff. A contract can be inferred, however, from the conduct of the parties. The defendant's representations regarding the plaintiff's vision improvement through RK were definite enough to manifest his intention to immediately undertake to improve the plaintiff's vision through RK. The parties, further, through their actions, inferentially recognized the existence of their contractual obligations. The plaintiff paid the defendant, and the defendant performed the RK procedure on the plaintiff's eyes. The plaintiff then subjected himself to another procedure that the defendant performed to help achieve the result for which the parties originally had contracted.

"The rules controlling appellate review of a directed verdict are well settled. Directed verdicts are not generally favored. A trial court's decision to direct a verdict can be upheld only when the jury could not reasonably and legally have reached any other conclusion. . . . We review a trial court's decision to direct a verdict for the defendant by considering all of the evidence, including reasonable inferences, in the light most favorable to the plaintiff." (Internal quotation marks omitted.) *Morales* v. *Pentec, Inc.*, 57 Conn. App. 419, 425, 749 A.2d 47 (2000). "The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) *Sandella* v. *Dick Corp.*, supra, 53 Conn. App. 218.

Because the plaintiff introduced at trial sufficient evidence so that the jury, reasonably and legally, could have found there was an implied contract, it was improper for the trial court to direct a verdict for the defendant. The court should have left the issue for the jury to decide.

## II

The plaintiff next claims that the court improperly directed a verdict for the defendant on the plaintiff's CUTPA claim. We disagree.

Our Supreme Court has made clear, in *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 699 A.2d 964 (1997), that a CUTPA claim can be successfully brought against a physician. In that case, our Supreme Court stated: "[O]nly allegations of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of a physician's practice may be brought under the [consumer protection act]. Allegations that concern misconduct in the actual performance of medical services or the actual practice of medicine would be improper." (Internal quotation marks omitted.) Id., 37, quoting *Nelson* v. *Ho*, 222 Mich. App. 74, 83–84, 564 N.W.2d 482 (1997).

In *Haynes*, the plaintiff's decedent, a rural letter carrier for the United States postal service, was seriously injured when her vehicle was struck head-on by another vehicle. *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 20. The decedent was transported via ambulance to Yale-New Haven Hospital (Yale-New Haven), where she was admitted to the emergency department. Id., 37. The decedent received emergency care from Yale-New Haven for a fractured left leg and pelvis. Id. After receiving care for approximately one and one-half hours, the decedent's abdomen began to expand. Id. Emergency exploratory surgery was performed on the decedent and it was discovered that her spleen had been lacerated, which resulted in blood filling her abdomen. Id. The decedent's circulation failed on the operating table, she went into cardiac arrest and subsequently died. Id.

The plaintiff thereafter brought an action against Yale-New Haven, alleging medical malpractice and a violation of CUTPA. Id., 21. On the CUTPA claim, the plaintiff alleged that Yale-New Haven had engaged in unfair and deceptive trade practices because, although Yale-New Haven was certified as a major trauma center, it had not met the standards of care required of such a center. Id. In essence, that claim was identical to the substance of the plaintiff's medical malpractice claim.

The court in *Haynes* concluded that although physicians and other health care providers are subject to CUTPA, medical malpractice does not fall under the act. Id., 35. The court held that "only the entrepreneurial or commercial aspects of the profession are covered . . . by CUTPA." Id., 34.

"[T]he touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 213, 746 A.2d 730 (2000); see also *Gadson* v. *Newman*, 807 F. Sup. 1412, 1419–20 (C.D. Ill. 1992) (contract for medical service should not be distinguished from ordinary commercial contracts for purposes of regulation under Illinois consumer fraud act; only actual practice of medicine, which is regulated by profession itself, is immunized from jurisdiction of consumer fraud act); *Nelson* v. *Ho*, supra, 222 Mich. App. 83 (physicians engaging in trade or commerce subject to Michigan consumer protection act only when partaking in entrepreneurial, commercial or business aspect of medicine).

Under CUTPA "[a]n act or practice is deceptive if three conditions are met. First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct." (Internal quotation marks omitted.) *Southington Savings Bank* v. *Rodgers*, 40 Conn. App. 23, 28, 668 A.2d 733 (1995), cert. denied, 236 Conn. 908, 670 A.2d 1307 (1996).

In its oral ruling on the defendant's motion for a directed verdict, the court stated that it would not reserve its ruling until the conclusion of trial. Instead, the court ruled in favor of the defendant by stating the following: "Then I grant the motion for directed verdict [on the breach of contract claim] and [the CUTPA claim]." In relation to the CUTPA claim, the court explained that "the general rule is [that] the entrepreneurial aspects of [the] practice of medicine . . . are covered by CUTPA. . . . 'Medical malpractice claims recast as CUTPA claims cannot form the basis of a CUTPA violation. To hold otherwise would transform every claim from medical malpractice into a CUTPA claim.' There has been no evidence whatsoever of any advertising. No exhibits of advertising have been produced. The only thing remotely involved is, I think, plaintiff said at one point he'd heard something, but exactly what is not in evidence. So, there's no evidence at all to satisfy either the entrepreneurial requirement or any advertising." Although the court gave the plaintiff the option of withdrawing the CUTPA claim before the end of the trial so that the jury would not have to be directed to find against the plaintiff on that claim, the court's ruling was unequivocal.

After close scrutiny of the trial transcript, we agree with the plaintiff that he presented some evidence dur-

ing his case-in-chief in relation to his CUTPA claim. We conclude, however, based on an examination of that evidence, that the evidence was insufficient to allow the issue to be decided by the jury.

The plaintiff testified that he was drawn to the defendant's practice by either a radio or print advertisement that stated that the RK procedure could cure nearsightedness. On cross-examination, the plaintiff admitted, however, that he did not construe the advertisement as representing that it could cure nearsightedness in all people. Further, the plaintiff offered certain pamphlets and brochures as evidence as well, but never asserted that they were deceptive or somehow unfair. Finally, the plaintiff testified that the defendant said he was "the best in the business" and made the plaintiff confident in his abilities to perform the RK procedure by telling him he had been successful on similar candidates. Nevertheless, although those statements and others may have represented medical malpractice to some extent or the makings of an implied contract, the plaintiff failed to present evidence during his case-in-chief to substantiate that those statements were deceptive, unfair or unconscionable in terms of the entrepreneurial or commercial aspects of the defendant's practice. Accordingly, we conclude that the evidence presented by the plaintiff in relation to his CUTPA claim was insufficient to allow the jury to find reasonably and legally in his favor, even when viewed in the light most favorable to the plaintiff. The plaintiff's claim that the court improperly directed a verdict for the defendant, therefore, is unavailing.

## III

The plaintiff next claims that the trial court improperly denied him the opportunity effectively to cross-examine the defendant's expert witness by refusing to allow him to use the witness' deposition testimony. We disagree.

"[A] trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion. . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling. . . . Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the [appellant] of substantial prejudice or injustice. . . . [A] party seeking a new trial because of an improper evidentiary ruling has the burden of demonstrating that the error was harmful. . . . When determining that issue in a civil case, the standard to be used is whether the erroneous ruling would likely affect the result. . . . The party is entitled to relief from an erroneous ruling on the admissibility of evidence only if the error is also harmful. . . . [T]he plaintiff [bears the] burden of demonstrating that the erroneous ruling was likely to affect the result of the trial." (Citations omitted; internal quotation marks omitted.) *Bugryn* v. *Bristol*, 63 Conn. App. 98, 111–12, 774 A.2d 1042, cert. denied, 256 Conn. 927, 776 A.2d 1143, cert. denied, 534 U.S. 1019, 122 S. Ct. 544, 151 L. Ed. 2d 422 (2001).

After a close inspection of the record we conclude that the plaintiff has failed to demonstrate that the court's ruling regarding the cross-examination of Nolan negatively affected the outcome of his case.

IV

The plaintiff's final claim is that the court improperly charged the jury and refused to give the plaintiff's requested charge. We disagree.

The plaintiff specifically claims that "[r]ather than present the case to the jury within the framework of the pleadings, the evidence, the arguments and the requests to charge, the trial court presented a textbook definition of medical malpractice, in general, followed

by a textbook definition of informed consent, in general." We are not persuaded that the court acted improperly.

"Our standard of review on this claim is whether it is reasonably probable that the jury was misled. . . . The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Therefore, jury instructions need not be exhaustive, perfect, or technically accurate. Nonetheless, the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Internal quotation marks omitted.) *Amsden* v. *Fischer*, 62 Conn. App. 323, 328–29, 771 A.2d 233 (2001). "As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 255 Conn. 782, 798, 772 A.2d 559 (2001). Having reviewed the court's charge to the jury, we are not persuaded that an injustice was done to either party.

The judgment is reversed in part and the case is remanded for a new trial on count four of the plaintiff's revised complaint alleging breach of contractual warranty. The judgment is affirmed as to counts one and seven.

In this opinion the other judges concurred.