## ALBERT JANUSAUSKAS *v.* RICHARD A. FICHMAN
## (SC 16823)

Sullivan, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued April 23—officially released July 22, 2003

*Kerry R. Callahan,* with whom was *Barbara A. Frederick,* for the appellant-appellee (defendant).

*Edward F. Hennessey,* with whom was *Linda L. Morkan,* for the appellee-appellant (plaintiff).

*Opinion*

KATZ, J. This certified appeal and cross appeal[1] arise from an action brought by the plaintiff, Albert Janusauskas, against the defendant, Richard A. Fichman, an ophthalmologist. The defendant claims, in his appeal, that the Appellate Court improperly reversed the portion of the trial court's judgment that had directed a verdict in his favor on the plaintiff's breach of contract claim. The plaintiff claims, in his cross appeal, that the Appellate Court improperly affirmed the portion of the trial court's judgment that had directed a verdict in favor of the defendant on the plaintiff's claim under the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Because we agree with the defendant and disagree with the plaintiff, we affirm in part, and reverse in part, the judgment of the Appellate Court.

The jury reasonably could have found the following facts.[2] The plaintiff suffers from severe myopia, or near-

----

[1] We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the plaintiff was entitled to a new trial on an implied contract theory?" *Janusauskas* v. *Fichman,* 261 Conn. 913, 806 A.2d 1054 (2002). We granted the plaintiff's cross petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that there was insufficient evidence to support a claim of a Connecticut Unfair Trade Practices Act violation by the defendant?" *Janusauskas* v. *Fichman,* 261 Conn. 913, 806 A.2d 1054 (2002).

[2] Although this case was tried to a jury, the issues on appeal center on the trial court's granting of a directed verdict. "In reviewing the trial court's

sightedness. Due to this condition, he has needed corrective lenses since childhood. Sometime in the late 1980s, the plaintiff learned of radial keratotomy (RK), a surgical procedure designed to correct myopia. The plaintiff believed that RK might cure his myopia and eliminate the need for eyeglasses or contact lenses. He therefore consulted with his optometrist and several ophthalmologists, at least one of whom told him that his myopia was too severe for RK to be effective.

Sometime in late 1992 or early 1993, the plaintiff saw or heard an advertisement for the defendant's ophthalmology practice. The advertisement indicated that the defendant was offering the RK procedure, and that this procedure could cure nearsightedness. On the basis of this advertisement, the plaintiff consulted with the defendant regarding the possibility of RK surgery. He told the defendant that his goal was to be able to see clearly without the aid of eyeglasses or contact lenses. The defendant indicated his confidence that, due to recent advancements in the field, RK could improve the plaintiff's uncorrected vision to 20/40 or 20/50 in his left eye and 20/20 in his right eye. The defendant explained that he successfully had performed a variation of RK on several patients with severe myopia, and that he believed that the plaintiff was a candidate for this procedure.

The defendant recommended a "monovision" approach to the plaintiff's treatment. Under this approach, one eye is designated as the "near vision" eye, while the other eye is designated as the "distance vision" eye. The defendant determined that, because the plaintiff's myopia was worse in his left eye, his left eye would become the plaintiff's near vision eye while his right eye would become the distance vision eye.

decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff." *Petyan* v. *Ellis*, 200 Conn. 243, 244, 510 A.2d 1337 (1986).

In May, 1993, the plaintiff visited the defendant's office for an "RK workup" to prepare for surgery. As part of this preparation, the plaintiff took a true/false quiz titled "Radial Keratotomy Informed Consent."[3] A member of the defendant's staff then reviewed the correct answers with the plaintiff, who subsequently signed a form that stated, "I have taken the informed consent quiz and am satisfied with my understanding of the procedure." The plaintiff also signed a consent form, which provided in relevant part: "The results of surgery cannot be guaranteed."[4] Finally, the defendant provided the plaintiff with informational materials explaining the RK procedure.

Approximately one week later, on May 21, 1993, the defendant performed the RK procedure on the plaintiff's left eye. Postoperative examinations in May, July and August of that year revealed that the plaintiff's uncorrected *near* vision in that eye had improved to 20/40. A subsequent examination in September, 1993, revealed that this improvement had regressed, however, possibly as a result of the healing process. In addition, the plaintiff's left eye vision had become distorted, and he experienced a glare effect that impeded his ability to drive.

[3] The quiz included the following true/false statements: "RK surgery is a COMPLETELY safe surgical procedure and is NOT subject to risk associated with other types of surgery." The correct answer is "False."

"During stabilization the quality of my vision may vary from morning to night and day to day." The correct answer is "True."

"At night I will probably experience a starburst like effect when looking at lights." The correct answer is "True."

"I could experience significant changes in vision for three or more months after the surgery." The correct answer is "True."

"The information I've received contained a COMPLETE list of complications and side effects that could occur with RK surgery." The correct answer is "False."

[4] The consent form also stated the potential complications of the RK procedure, including, but not limited to: impaired vision; blindness; a permanent increase in sensitivity to light, glare or variation in vision; and "starburst like images around lights . . . ."

Consequently, the defendant performed enhancement surgery on the plaintiff's left eye in September, 1993. After the second surgery, however, the plaintiff continued to experience distortion and glare in his left eye, particularly at night. Although postoperative examinations revealed some reduction in the plaintiff's left eye myopia, the defendant decided that the plaintiff should continue to use a corrective lens for that eye until it healed fully.

The defendant examined the plaintiff eight times between September, 1993, and September, 1994. During this time, the plaintiff's *corrected* vision in his left eye ranged from 20/25 to 20/80. On March 20, 1995, an optometrist in the defendant's office reported that the plaintiff's left eye vision was "stable." Four days later, however, the plaintiff told the defendant that both the near and distance vision in his left eye was distorted. The defendant fitted the plaintiff with reading glasses. The defendant continued to treat the plaintiff through the end of 1995. As a result of his dissatisfaction with the result of his surgeries, the plaintiff consulted with two other ophthalmologists, and thereafter terminated his treatment with the defendant. The defendant refunded the plaintiff's prepayment, with interest, for the surgery that never was performed on the plaintiff's right eye. Additional facts will be provided as necessary.

The plaintiff brought this action against the defendant seeking damages for the impairment to his vision. The plaintiff subsequently withdrew five of the eight counts of his revised complaint. The remaining counts alleged: (1) medical malpractice and lack of informed consent; (2) breach of contract; and (3) a violation of CUTPA. Specifically, the medical malpractice claim was predicated on the representations allegedly made by the defendant regarding the results that the plaintiff could expect and the defendant's alleged misdiagnosis of the plaintiff's suitability for RK.

At the close of the plaintiff's case-in-chief, the defendant moved for a directed verdict on the breach of contract and CUTPA claims. The trial court granted the motion and directed a verdict in favor of the defendant on both claims. Specifically, with respect to the breach of contract claim, the trial court noted that the evidence showed merely that the plaintiff had "interpreted [the defendant's] confidence" regarding the potential results as a guarantee, and the court therefore concluded that the evidence was insufficient to support a finding of a meeting of the minds required to form a contract. With respect to the CUTPA claim, the trial court concluded, on the basis of our decision in *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 699 A.2d 964 (1997), that the evidence was insufficient to support a finding of a CUTPA violation because the claim did not pertain to an entrepreneurial aspect of the defendant's medical practice. The court submitted the malpractice and lack of informed consent claim to the jury, which found for the defendant. Accordingly, the trial court rendered judgment in favor of the defendant.

The plaintiff subsequently appealed to the Appellate Court, challenging, inter alia, the trial court's judgment based on the granting of directed verdicts on the breach of contract and CUTPA claims.[5] The Appellate Court affirmed in part, and reversed in part, the judgment of the trial court. *Janusauskas* v. *Fichman*, 68 Conn. App. 672, 793 A.2d 1109 (2002). The Appellate Court reversed the trial court's judgment on the breach of contract claim. After summarily concluding that there had been no express contract between the parties, the Appellate

---

[5] The plaintiff also claimed that the trial court improperly had: (1) denied him his right to cross-examine the defendant's expert witness; and (2) charged the jury on the law of negligence and informed consent. *Janusauskas* v. *Fichman*, 68 Conn. App. 672, 673, 793 A.2d 1109 (2002). The Appellate Court affirmed the judgment of the trial court with respect to both of those issues. Id., 682–84. The plaintiff has not challenged those rulings in his appeal to this court.

Court held that the evidence was sufficient to permit the jury to find the existence of an *implied* contract based on the conduct of the parties. Id., 678. Specifically, the court concluded that "[t]he defendant's representations regarding the plaintiff's vision improvement through RK were definite enough to manifest his intention to immediately undertake to improve the plaintiff's vision through RK." Id. Accordingly, the Appellate Court remanded the case to the trial court to allow the plaintiff to pursue this claim under an implied contract theory. Id., 684. The Appellate Court affirmed the trial court's judgment on the CUTPA claim, concluding that the trial court properly had determined that the evidence was insufficient to establish a CUTPA violation because it did not pertain to the " 'entrepreneurial or commercial aspects' " of the defendant's medical practice. Id., 680, quoting *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 34. This appeal and cross appeal followed.

As a preliminary matter, we note that this appeal is before us pursuant to the granting of a directed verdict. The standards for appellate review of a directed verdict are well settled. "Directed verdicts are not favored. . . . A trial court should direct a verdict only when a jury could not reasonably and legally have reached any other conclusion. . . . In reviewing the trial court's decision to direct a verdict in favor of a defendant we must consider the evidence in the light most favorable to the plaintiff." (Citations omitted; internal quotation marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 135–36, 757 A.2d 516 (2000); *Petyan* v. *Ellis*, 200 Conn. 243, 244, 510 A.2d 1337 (1986); *Puro* v. *Henry*, 188 Conn. 301, 303, 449 A.2d 176 (1982). Although "it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation." (Citation omitted.) *Gagne* v. *Vaccaro*, 255 Conn. 390, 400, 766 A.2d 416 (2001). "A

directed verdict is justified if . . . the evidence is so weak that it would be proper for the court to set aside a verdict rendered for the other party." (Internal quotation marks omitted.) *Santopietro* v. *New Haven*, 239 Conn. 207, 225–26, 682 A.2d 106 (1996).

I

We first consider the defendant's claim that the Appellate Court improperly reversed the judgment of the trial court granting a directed verdict for the defendant on the breach of contract claim. Specifically, the defendant contends that the plaintiff is not entitled to a new trial on the issue of breach of an *implied* in fact contract because the plaintiff waived that theory by not pursuing it at trial. The plaintiff contends that he tried his case on neither an express nor implied contract theory, but merely as a breach of contract.[6] We agree with the defendant.

"Whether [a] contract is styled express or implied involves no difference in legal effect, but lies merely in the mode of manifesting assent." (Internal quotation marks omitted.) *Boland* v. *Catalano*, 202 Conn. 333, 337, 521 A.2d 142 (1987). "A true implied [in fact] contract can only exist [however] where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words. Such a contract arises where a plaintiff, without being requested to do

---

[6] We feel constrained to note that the appendix accompanying the plaintiff's brief contains a summary paraphrasing trial testimony, and that the plaintiff cites to this summary throughout his brief. Although Practice Book § 67-8 authorizes the use of an appendix "to excerpt lengthy exhibits or quotations from the transcripts," nothing in the rules of practice authorizes a paraphrased summary of testimony at trial. A party may paraphrase portions of the trial transcript only within the confines of the party's brief. Accordingly, we shall disregard those portions of the plaintiff's appendix that do not conform to the guidelines set forth in the rules of practice. See Practice Book § 60-2 (reviewing court may, "on its own motion or upon motion of any party . . . [3] order improper matter stricken from the record or from a brief or appendix").

so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services. In such a case, the law implies from the circumstances, a promise by the defendant to pay the plaintiff what those services are reasonably worth." (Internal quotation marks omitted.) *Bershtein, Bershtein & Bershtein, P.C.* v. *Nemeth*, 221 Conn. 236, 241–42, 603 A.2d 389 (1992); *Freda* v. *Smith*, 142 Conn. 126, 134, 111 A.2d 679 (1955). Although both express contracts and contracts implied in fact depend on actual agreement; *Coelho* v. *Posi-Seal International, Inc.*, 208 Conn. 106, 111, 544 A.2d 170 (1988); "[i]t is not fatal to a finding of an implied contract that there were no express manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations." *Rahmati* v. *Mehri*, 188 Conn. 583, 587, 452 A.2d 638 (1982).

The record reflects that the plaintiff tried his breach of contract claim under an express contract theory. The plaintiff's revised complaint specifically alleged that the defendant had "guaranteed to [the plaintiff] that the result would be 20/20 right uncorrected and 20/50 left uncorrected." The plaintiff further alleged that the "difficulties and effects [from the surgeries] are the result of [the defendant's] breach of his contractual promise, guarantee or warranty to correct [the plaintiff's] vision to 20/20 uncorrected in his right eye and 20/50 uncorrected in his left eye." At trial, the plaintiff testified that the defendant had represented that he could improve the plaintiff's uncorrected vision to 20/40 or 20/50 in the left eye and 20/20 in the right eye.

Moreover, the defendant's motion for a directed verdict on the breach of contract claim was based on his contention that the evidence was insufficient to support the finding of an "expressed promise," thereby evincing that the defendant understood the claim as one of

express contract. In opposing the defendant's motion, the plaintiff similarly characterized the defendant's conduct as either an "expressed promise" or "expressed representations" that induced the plaintiff to pay the defendant and undergo the surgery. The trial court granted the defendant's motion based on its conclusion that the plaintiff had failed to establish the elements necessary for an express contract. Indeed, in his brief to this court, the plaintiff asserts that an express promise formed the basis of an implied in fact contract. Therefore, the gravamen of the plaintiff's breach of contract claim, as pursued at trial, was that there had been an express manifestation of mutual assent between the parties. An express manifestation of mutual assent gives rise to an *express* contract. See *Rahmati* v. *Mehri*, supra, 188 Conn. 587.

It equally is clear that the plaintiff did not pursue an implied contract theory at trial.[7] Neither in the plaintiff's revised complaint nor in his arguments to the trial court did the plaintiff claim that, in the absence of an express contract, the existence of an implied contract could be inferred from the parties' conduct. Although the defendant, based on the plaintiff's own admissions on cross-examination, successfully undermined the plaintiff's claim of an express contract guaranteeing specific results,[8] the absence of that promise did not give rise

[7] We previously have not addressed the issue of whether an implied in fact contract claim can arise against a physician with respect to medical treatment. Cf. *Toppino* v. *Herhahn*, 100 N.M. 585, 588, 673 P.2d 1318 (App. 1983) (holding that there is no cause of action based on "implied warranty for particular result" against physician with respect to medical services). Because we conclude that, as a matter of law, the plaintiff did not pursue an implied contract theory in this case, we need not decide the question of whether that theory is available in a cause of action against a physician.

[8] On cross-examination, the plaintiff admitted that the defendant never had promised or guaranteed that the plaintiff's vision would improve to any specific level on an eye chart. The plaintiff also admitted that the defendant never had used the words "guarantee" or "warranty." Rather, the plaintiff testified that the defendant had discussed the RK procedure with such confidence that the plaintiff understood his words as a promise.

to an implied contract in this case.[9] Accordingly, the plaintiff is not entitled to pursue an implied contract theory for the first time on appeal.

Our law is well settled that a party "may not try its case on one theory and appeal on another." *Mellon* v. *Century Cable Management Corp.*, 247 Conn. 790, 799, 725 A.2d 943 (1999), citing *Levine* v. *Stamford*, 174 Conn. 234, 236, 386 A.2d 216 (1978); *Gustave Fischer Co.* v. *Morrison*, 137 Conn. 399, 404, 78 A.2d 242 (1951). "[O]nly in [the] most exceptional circumstances can and will this court consider a claim . . . that has not been raised and decided in the trial court." (Internal quotation marks omitted.) *Rybinski* v. *State Employees' Retirement Commission*, 173 Conn. 462, 466, 378 A.2d 547 (1977); see Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"). We will not review unpreserved claims unless "the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *A-G Foods, Inc.* v. *Pepperidge Farm, Inc.*, 216 Conn. 200, 211, 579 A.2d 69 (1990).

The plaintiff's breach of contract claim was neither tried nor decided in the trial court under an implied

---

[9] Nevertheless, we recognize that there was an express contract between the parties, albeit not the one that the plaintiff sought to prove at trial. The parties expressly contracted for the defendant to perform the RK procedure on the plaintiff for a fee. This express contract was predicated partly on the consent form signed by the plaintiff, which specifically provided that "[t]he results of surgery cannot be guaranteed." Where there is a controlling express contract, the parties will be bound by that contract to the exclusion of inconsistent implied contract obligations. *H. B. Toms Tree Surgery, Inc.* v. *Brant*, 187 Conn. 343, 346–47, 446 A.2d 1 (1982). Accordingly, even if we were to assume, arguendo, that the conduct of the parties gave rise to an implied in fact contract regarding a specific result, the plaintiff could not prevail under that theory because the implied contract would have been superseded by the express terms of the consent form. See id.

contract theory, and this case presents no exceptional circumstances that would warrant consideration of this theory on appeal. Accordingly, the Appellate Court improperly concluded that the plaintiff could pursue this theory in a new trial.

## II

We turn next to the plaintiff's claim that the Appellate Court improperly affirmed the portion of the trial court's judgment directing a verdict for the defendant on the CUTPA claim. The plaintiff claims that the evidence presented at trial pertained to an entrepreneurial aspect of the defendant's medical practice, under *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 17, and was therefore sufficient to support a finding for the plaintiff on his CUTPA claim.[10] Specifically, the plaintiff relies on the defendant's advertisements and representations concerning the defendant's ability to correct visual deficiencies in general, and with respect to the plaintiff in particular. We disagree.

We previously have concluded that, although physicians and other health care providers are subject to CUTPA, they may be liable only for "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect" of the practice of medicine. (Internal quotation marks omitted.) Id., 37, quoting *Nelson* v. *Ho*, 222 Mich.

[10] "[I]n determining whether a practice violates CUTPA we have adopted the criteria set out . . . by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of [a violation of CUTPA]." (Internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 644, 804 A.2d 180 (2002).

App. 74, 84, 564 N.W.2d 482 (1997). The practice of medicine may give rise to a CUTPA claim "only when the actions at issue are *chiefly* concerned with 'entrepreneurial' aspects of practice, such as the solicitation of business and billing practices, as opposed to claims directed at the 'competence of and strategy' employed by the . . . defendant." (Emphasis added.) *Ikuno* v. *Yip*, 912 F.2d 306, 312 (9th Cir. 1990) (applying state of Washington's Consumer Protection Act); see *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 35–37 (approving of reasoning in *Ikuno*).

"[T]he touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation. To hold otherwise would transform every claim for medical malpractice into a CUTPA claim. Accordingly, within this framework, we must review the plaintiff's allegations of CUTPA violations and look to the underlying nature of the claim to determine whether it is really a medical malpractice claim recast as a CUTPA claim." *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 38.

In *Haynes*, this court addressed a CUTPA claim in the context of a medical malpractice action against a hospital. The plaintiff's decedent had died while undergoing emergency surgery at Yale-New Haven Hospital (Yale-New Haven). Id., 20. The plaintiff thereafter had brought an action for damages against Yale-New Haven claiming medical malpractice and a violation of CUTPA. The gravamen of the plaintiff's CUTPA claim was that Yale-New Haven had committed an unfair trade practice in deceptively holding itself out as a major trauma center. Id., 21. Although Yale-New Haven actually was certi-

fied as a major trauma center, the plaintiff contended that it had violated CUTPA by not meeting the standard of care required of such a center. Id., 38. We concluded that this claim did not state a cause of action under CUTPA. "[T]his representation is simply what all physicians and health care providers represent to the public—that they are licensed and impliedly that they will meet the applicable standards of care. If they fail to meet the standard of care and harm results, the remedy is not one based upon CUTPA, but upon malpractice." Id., 39.

In the present case, the defendant presented the plaintiff with informational materials, including a brochure that described the defendant as "one of the country's leading doctors in his field."[11] Like Yale-New Haven's representation in *Haynes* that it was a major trauma center, this statement simply represents to the public that the defendant will meet the standard of care applicable to a "leading doctor." If the defendant fails to meet this standard of care and harm results, the remedy would be based upon malpractice, and not upon CUTPA.

Moreover, the defendant made representations, within the course of treatment, that implicate the doctrine of informed consent. Informed consent requires a physician "to provide the patient with the information which a reasonable patient would have found material for making a decision whether to embark upon a contemplated course of therapy."[12] (Internal quotation

[11] Although the plaintiff claims in his brief to this court that he read this brochure during a visit to the defendant's office, the evidence is unclear as to when or if the plaintiff actually did read the brochure. The defendant testified that he had created the brochure six months after performing the RK procedure on the plaintiff.

[12] "[I]nformed consent involves four specific factors: (1) the nature of the procedure; (2) the risks and hazards of the procedure; (3) the alternatives to the procedure; and (4) the anticipated benefits of the procedure." *Alswanger v. Smego*, 257 Conn. 58, 67–68, 776 A.2d 444 (2001); *Logan v. Greenwich Hospital Assn.*, 191 Conn. 282, 292, 465 A.2d 294 (1983).

marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, supra, 254 Conn. 143; *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 292–93, 465 A.2d 294 (1983). In the present case, the defendant told the plaintiff that he successfully had performed RK on severely myopic patients, and that he thought he could improve the plaintiff's vision to 20/40 or 20/50 in his left eye and 20/20 in his right eye. These representations are of the sort that physicians and other health care providers may make to their patients within the course of treatment. They are representations that a reasonable patient may find material in determining whether to undergo a contemplated course of therapy, such as the RK procedure. As with representations regarding the standard of care, if these representations fail to satisfy the requirement of informed consent, and harm results, the remedy would be based upon malpractice, and not upon CUTPA.

Nevertheless, the plaintiff contends that the defendant violated CUTPA through "aggressive" marketing techniques aimed at transforming the defendant's medical practice into a "profit center."[13] Although advertising, independent of treatment, clearly can be an entrepreneurial aspect of the practice of medicine, the

[13] The plaintiff also contends in his brief, along a similar vein, that "a doctor's actions are entrepreneurial if undertaken in order to gain patients or to increase profits." We previously have stated, however, that with respect to the practice of law, "[m]any decisions made by attorneys eventually involve personal profit as a factor, but are not considered part of the entrepreneurial aspect of practicing law." *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 783, 802 A.2d 44 (2002). "Using an attorney's financial considerations as a screening mechanism for separating professional actions from entrepreneurial ones would dissolve the distinction between the two, subjecting attorneys to CUTPA claims for any decision in which profit conceivably could have been a factor." Id. Because attorney liability under CUTPA, like physician liability, is limited to entrepreneurial actions, we see no reason why our reasoning in *Suffield Development Associates Ltd. Partnership* should not apply with equal force to the present case.

evidence in the present case is insufficient to support a conclusion that the defendant's advertising practices violated CUTPA. The plaintiff testified that he either had seen or heard one of the defendant's advertisements, yet he did not present this advertisement into evidence. According to the plaintiff's testimony, the advertisement stated that the defendant was offering the RK procedure, and that RK can cure nearsightedness. The plaintiff does not dispute that these representations are true; indeed, he testified that he never construed the advertisement as representing that RK can cure near-sightedness in *all* people. Although the defendant's advertising was, independent of the other evidence proffered by the plaintiff, entrepreneurial in nature, the plaintiff has not shown that this advertising was unfair, unconscionable or deceptive. See General Statutes § 42-110b (a). Accordingly, we conclude that the Appellate Court properly affirmed the portion of the trial court's judgment granting a directed verdict for the defendant with respect to the CUTPA claim.

The judgment of the Appellate Court is affirmed in part and reversed in part, and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.