******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., with whom ROGERS, C. J., joins, dissenting. I respectfully dissent. In my opinion, the conclusion reached by the majority misapprehends the significance of the written correspondence sent by the plaintiff, Connecticut Light and Power Company, to the defendant, Gary Proctor, immediately after the November 26, 2008 telephone call. Specifically, I would conclude that the consequence of the plaintiff's written correspondence was to render objectively unreasonable the expectation of the plaintiff that the defendant would pay for the electric service provided to a farm leased by the defendant's employer, Pedigree Chicks, LLC, and located at 44 Upper Butcher Road in Ellington (farm). Accordingly, I would conclude that the Appellate Court incorrectly affirmed the judgment of the trial court because the trial court's finding of an implied in fact contract was clearly erroneous.

I agree with the majority's statement of the facts and procedural history. I will set forth additional facts and evidence from the record as necessary.

The principles governing implied in fact contracts[1] are well established. "Whether [a] contract is styled express or implied involves no difference in legal effect, but lies merely in the mode of manifesting assent. . . . A true implied [in fact] contract can only exist [however] where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words. . . . Although both express contracts and contracts implied in fact depend on actual agreement . . . [i]t is not fatal to a finding of an implied contract that there were no express manifestations of mutual assent if the parties, by their conduct, recognized the existence of contractual obligations." (Citations omitted; internal quotation marks omitted.) *Janusauskas* v. *Fichman*, 264 Conn. 796, 804–805, 826 A.2d 1066 (2003). "It is a fundamental principle of contract law that the existence and terms of a contract are to be determined from the intent of the parties. . . . The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." (Internal quotation marks omitted.) *Auto Glass Express, Inc.* v. *Hanover Ins. Co.*, 293 Conn. 218, 225, 975 A.2d 1266 (2009); see also *Otto Contracting Co.* v. *S. Schinella & Son, Inc.*, 179 Conn. 704, 709, 427 A.2d 856 (1980) ("whether a contractual commitment has been undertaken is ultimately a question of the intention of the parties"). I agree with the majority that the inquiry in this case is "whether [the services] were rendered [by the plaintiff] under such circumstances that the defendant either knew, or, as a reasonable man, should have known, that the plaintiff expected compensation."

*Butler* v. *Solomon*, 127 Conn. 613, 616, 18 A.2d 685 (1941).

Generally speaking, the determination of the parties' intent is a question of fact, and our review is limited to whether the decision of the trial court was clearly erroneous. See *Auto Glass Express*, *Inc.* v. *Hanover Ins. Co.*, supra, 293 Conn. 225; see also *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007). This court "will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole . . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Community Collaborative of Bridgeport, Inc.* v. *Ganim*, 241 Conn. 546, 559, 698 A.2d 245 (1997).

I do not disagree with the majority that the record supports the finding that when the defendant contacted the plaintiff's representative and provided his personal information that the defendant intended to take personal responsibility for the electric service that would be provided to the farm. But the plaintiff did not simply commence the requested service. To the contrary, the plaintiff sent to the defendant a written correspondence. Where I part ways with the majority is the significance of the written correspondence. The trial court, in its memorandum of decision, ignored the significance of this correspondence in its determination as to whether an implied in fact contract was formed. To me, this correspondence conveyed a clear message to the defendant that he was required to take additional action to establish an account and take responsibility for the electric service provided to the farm. Accordingly, I would conclude that the consequence of the correspondence was such that a reasonable person would believe that the process required for assuming responsibility for electric service was incomplete. Therefore, the plaintiff, by not awaiting the defendant's completion of the application process, did not render services under circumstances in which it would be reasonable for it to expect compensation from the defendant.

In the present case, the written correspondence was in two parts: a letter from the plaintiff dated November 26, 2008, the same date as the defendant's telephone call and a partially filled out "[a]pplication for [s]ervice." At the outset, the letter thanks the defendant for his "request for electric service from [the plaintiff]." The very next paragraph recites a *requirement* of a security deposit for the account. The letter states that the deposit

"must be paid promptly" and indicates that the defendant would be billed for it "shortly." Next, the letter refers to the enclosed "[a]pplication for [s]ervice." The letter requests that the defendant complete and return the application for service within seven days either by fax or mail. The letter did not state that the defendant would be held responsible for electric service provided to the farm in accordance with his oral request made during the November 26, 2008 telephone call. Nor did it state that he should be expecting a bill for the provision of electric service.

The application for service, in turn, contains several recitals. In relevant part, the recitals include: "The undersigned hereby requests the [plaintiff] to supply service at the address specified above, and/or at any other addressed furnished to the [plaintiff] by the undersigned and which is served by the [plaintiff] . . . . The undersigned also agrees to receive and pay for such service in accordance with the applicable [s]chedule and further agrees to pay for all charges and costs, including reasonable attorney's fees, incurred in collecting sums due to the [plaintiff] for the service rendered to the undersigned. The undersigned also agrees to be responsible for billings to this account, and any other accounts which are established under this exact legal name or entity, until official notification is made to the [plaintiff] to close such account. Any deposit made in connection with this application is subject to revision at any time if usage is greater than that estimated by the undersigned and the [plaintiff]." The top of the application for service contains spaces for the service address, mailing address and account name. These spaces had been previously filled in by the plaintiff with the information presumably provided by the defendant in the November 26, 2008 telephone call. The application for service also contains, inter alia, unfilled spaces for the relevant information of persons with an ownership interest in the business, an indication whether a "DBA certificate" has been filed, and bank references. Finally, at the bottom of the form, there is a signature block and a space requesting a Social Security number following the recital that "I agree to the above conditions and certify the statements are true, accurate and correct."

The context of this letter is critical to my conclusion that the trial court's finding was clearly erroneous. The record is devoid of indicia that the plaintiff manifested assent to defendant's request for electric service. The plaintiff's record of the November 26, 2008 conversation reveals little as to communication *to* the defendant by the plaintiff's representative. To be sure, the record recites internal action that the representative took to begin the process necessary for the account to be set up in the name of the defendant.[2] There is no evidence in the record that this was communicated to the defendant. The record reveals that the representative verified

the defendant's mailing address and quoted a deposit in the amount of $2520, but there is no indication that it was represented to the defendant that a deposit was required. Instead, in response to the defendant's request for electric service, the representative "contemporaneously" generated and sent the correspondence with the creation of the account. In the letter and application for service, the plaintiff indicates that the defendant "must" pay the "required" deposit. Additionally, the plaintiff proposed that the defendant, as part of his request for electric service for which he would agree to pay, should also agree to the condition that the deposit would be revised if electricity usage is greater than estimated. In addition, the plaintiff proposed that the defendant agree to be responsible for all charges and costs, including attorney's fees, incident to any collections undertaken by the plaintiff. There is no evidence that the defendant proposed, contemplated, or agreed to such terms in the November 26, 2008 telephone call. Rather, as the plaintiff's letter indicates, the defendant simply requested service. The correspondence to the defendant, taken as a whole, clearly conveys that additional action on the part of the defendant was necessary to complete his application for service.

Upon due consideration of the effect of the plaintiff's correspondence, the evidence cited by the majority fails to support a finding of an implied in fact contract. The majority points out that there is no dispute that the defendant knew that the plaintiff was providing electric service to the farm. I am not convinced that, given this set of facts, that the defendant's knowledge regarding electricity service can support an implied in fact contract that he was going to pay for those services. This is also not a case in which the plaintiff began performing services in response to a request by the defendant that it was not already performing. Cf. *Butler* v. *Solomon*, supra, 127 Conn. 614–15 (defendant asked plaintiff to perform certain work defendant had agreed to perform for third party); *Casey* v. *MacFarlane Bros. Co.*, 83 Conn. 442, 443, 76 A. 515 (1910) (defendant asked plaintiff to do additional work in connection with construction of factory). The record reflects, and the majority agrees, that throughout a period starting even before the defendant's abortive attempt to set up an account in August, 2008, the plaintiff was providing electric services to the farm. Consequently, the defendant would have had no basis to know that electricity was being provided to the farm as a result of his request or that the plaintiff expected compensation from him in light of the fact that he did not complete and return the application for service or pay the required deposit. According to the record, in his very first contact with the plaintiff's representative after receiving this correspondence, the defendant expressly stated to the representative that the account should not be in his name. To be sure, the defendant did also inquire about not

receiving a bill. This, however, does not, as the majority suggests, "[compel] the conclusion that he knew that services were being rendered and that bills were accruing on the account, notwithstanding his failure to submit the application or pay the security deposit." Indeed, the record reflects that the plaintiff expressly stated in its letter that the defendant would receive a bill for the required deposit "shortly." The defendant had no reason to believe that he would receive a bill for any services provided to the farm given that he did not provide the required deposit and he did not sign and return the application for service. Likewise, evidence of the defendant's subjective knowledge in January and February, 2009, of the plaintiff's intention to bill the defendant for the electric service does not support an implied in fact contract because the defendant did not complete the process indicated by the plaintiff for assuming responsibility for the electric service.

A reasonable person would believe, and the defendant did believe, that, upon receipt of the plaintiff's correspondence, there had not yet been a meeting of the minds and that compliance with the plaintiff's request to sign and return the application for service, which included assent to the terms proposed therein, and payment of the required deposit were steps necessary to consummate an agreement. To the extent that the trial court made the necessary implicit subordinate factual finding otherwise, I would conclude that finding was clearly erroneous. The majority's conclusion in the present case allows the plaintiff to have used the correspondence to create the illusion of the power of acceptance in the defendant, while actually retaining for itself the power to proceed with the contract by merely continuing to provide electric services to the farm. The plaintiff's correspondence understandably led the defendant to believe the ball was in his court as to whether to proceed with the contract for service on the terms indicated in the correspondence; it is little wonder that the defendant was "scared" when he found out that the plaintiff intended to hold him responsible for the electric service given he never signed and returned the application to the plaintiff or paid the required deposit. I agree with the majority's observation that if the defendant had completed, signed, and returned the written application for service, that fact would establish an express contract. I disagree, however, with the majority that the plaintiff in the present case could simply continue to furnish electric service thereby creating an implied in fact contract in lieu of its proposed express contract to which the defendant never agreed. On the basis of this evidence, I am left with the definite and firm conviction that a mistake has been committed. Accordingly, I would reverse the judgment of the Appellate Court concluding that the trial court's finding of an implied in fact contract was not clearly erroneous and remand the case to the Appellate Court with instruc-

tions to reverse the judgment of the trial court and remand the case to the trial court with direction to render judgment for the defendant.

   I respectfully dissent.

[1] The term implied contract refers to both implied in fact contracts and implied in law contracts. "An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties. . . . On the other hand, an implied in law contract is not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation . . . . It is based on equitable principles to operate whenever justice requires compensation to be made. . . . An implied in law contract may arise due to one party being unjustly enriched to the detriment of the other party. . . . Accordingly, an implied in law contract is another name for a claim for unjust enrichment." (Citations omitted; internal quotation marks omitted.) *Vertex*, *Inc.* v. *Waterbury*, 278 Conn. 557, 573–74, 898 A.2d 178 (2006). This case concerns an implied in fact contract.

[2] In the November 26, 2008 call log there is an annotation "UNABLE TO CLS ORDER//PROCESSED CBS REF TO HAVE ACCT SET UP . . . ." The plaintiff's primary witness, Jennifer Dupuis, who had experience monitoring delinquent accounts for the plaintiff, testified that this entry mentioning a "CBS REF" was merely a record that a submission to the billing department was necessary "to close the order to show that the account is now active and being billed on a regular basis." In other words, it was a memorialization of what the plaintiff's representative did. There is also an annotation that the bill was cancelled back to June 20, 2008, for the previous customer.