Deborah MAHON, on behalf of herself
and all others similarly situated,
Plaintiff,

v.

**CHICAGO TITLE INSURANCE
COMPANY, Defendant.**

No. 3:09CV690(AWT).

United States District Court,
D. Connecticut.

Sept. 30, 2013.

Ingrid L. Moll, Mathew P. Jasinski, William H. Narwold, Motley Rice LLC, Hartford, CT, for Plaintiff.

Derek Diaz, Robert J. Fogarty, Hahn Loeser & Parks LLP, Cleveland, OH, Heather R. Spaide, Casper & De Toledo, Stamford, CT, Jonathan S. Bowman, Stewart I. Edelstein, Cohen & Wolf, P.C., Bridgeport, CT, for Defendant.

### RULING ON MOTION FOR CLASS CERTIFICATION

ALVIN W. THOMPSON, District Judge.

Plaintiff Deborah Mahon ("Mahon") moves for certification of a class consisting of all persons who paid for a lender's policy of title insurance issued by the defendant, Chicago Title Insurance Company ("Chicago Title"), and its agents in connection with the refinancing of a mortgage loan on property located in Connecticut that was completed any time from January 1, 2000 to the present (the "Class Period") where the subject property previously had been mortgaged by an institutional first mortgage within the statutorily applicable look-back period and paid more than the statutory discounted refinance rate for such title insurance as set forth in the defendant's rate manual to eligible Connecticut borrowers. Mahon claims that the defendant (1) overcharged her for title insurance in connection with a refinance transaction on June 30, 2003; and (2) engaged in the routine, wrongful practice of overcharging borrowers entitled to the discounted refinance rate for title insurance. The defendant contends that the plaintiff cannot meet the requirements of Fed.R.Civ.P. 23, and therefore, the proposed class cannot be certified. The plaintiff's motion is being granted.

## I. FACTUAL BACKGROUND

The plaintiff brings this action against Chicago Title for title insurance overcharges during the period from January 1, 2000 to the present, asserting claims for unjust enrichment, breach of implied contact, and money had and received.

### A. The Nature of Title Insurance

■ Title insurance is designed to guarantee clear ownership of real property that is being sold and to insure against defects, liens or encumbrances in the title existing at the time of issuance. A lender's policy of title insurance protects a lender, whose loan is secured by a mortgage on the property, against non-recorded claims of an interest in the property. In its underwriting guidelines, the Federal National Mortgage Association ("Fannie Mae") requires buyers to purchase a lender's policy of title insurance in all mortgage transactions.

### B. Chicago Title's Premium Rates for Title Insurance Policies

Pursuant to Conn. Gen.Stat. § 38a–419(a), Chicago Title files "premium rate schedules it proposes to use in this state" with the Connecticut Insurance Commissioner. *Id.* Title insurers and their agents may not "use or collect any premium after October 1, 1990, except in accordance with the premium rate schedule filed with and approved by the commissioner as required by" Conn. Gen.Stat. § 38a–419(c). Since at least 1992, Chicago Title's rates have included a basic rate and a refinance rate.

### 1. Pertinent Rate Manual Provisions

Every refinance transaction involves an existing mortgage loan that is being refinanced, either the original mortgage loan taken out to purchase the property or a subsequent refinancing. During the Class Period, Chicago Title's Connecticut Rate Manuals provided eligible borrowers with a discounted rate in refinance transactions. From as early as 1992 through September 26, 2006, Chicago Title's refinance discount provision was as follows:

#### REFINANCE MORTGAGE POLICIES

Whenever mortgage insurance is applied for within ten (10) years from the date of the issuance of a policy, and the premises to be insured are identical, and there has been no change in fee ownership, the Company may accept application, the charge for which insurance shall be sixty (60%) percent of the applicable scheduled rate up to the largest amount of existing insurance, plus the full applicable schedule rate on the excess amount. In no event shall the charge for such a policy be less than $100.00.

Pl.'s Mot. Class Cert., Ex. A, Rate Manual (eff. 4/15/1992) at 14; Ex. B, Rate Manual (eff. 12/4/1995) at 14; Ex. C, Rate Manual (eff. 8/2001) at 13; *see id.,* Ex. EEE, Chicago Title Dep. (Fanning) at 53:14–58:8, 73:21–74:5. The ten-year period referenced in the provision is also known as the "look-back" period. The rationale for the refinance discount is that if the title insurance policy was issued within the look-back period with respect to a property, the lender assumes less risk than when issuing a new policy on that property.

In September 2006, Chicago Title amended its Connecticut refinance provision and removed the look-back period discount. Instead, the manual allowed a discount whenever a new mortgage fully pays off an existing mortgage, regardless of whether the existing mortgage was insured. Since September 7, 2006, Chicago Title's refinance rate provisions provide the following:

#### Refinance Mortgage Policies

1. Whenever mortgage insurance is to be issued on a 1–4 family residential property, which fully pays off a mortgage or mortgages on the same premises and where there has been no change in the beneficial ownership or the only change in ownership is between spouses, the charge for such ownership shall be 60 per cent of the applicable scheduled rate up to the original principal amount of the mortgage(s) being paid off, plus the full applicable scheduled rate on any excess.

. . . .

In no event shall the charge for such a policy be less than $100.00.

*Id.,* Ex. D, Rate Manual (eff. 9/27/2006)·at 13; Ex. E, Rate Manual (eff. 11/2/2006) at 13; Ex. F, Rate Manual (eff. 4/18/2008 at 13; Ex. G, Rate Manual (eff. 8/15/2009) at 13; Ex. H, Rate Manual (eff. 9/15/2009) at 13; Ex. I, Rate Manual (eff. 11/1/2009) at 1; Ex. J, Rate Manual (eff. 1/2010); *see also id.* Ex. EEE, Chicago Title Dep. (Fanning) at

58:9–61:18, 63:19–64:18, 65:15–66:25, 67:5–25; 69:24–72:5.

The defendant states that for transactions involving approved attorneys, Chicago Title first checked its internal database of prior policies, called a title plant. If a prior policy existed, Chicago Title provided the refinance discount on the premium invoice. For transactions involving other policy-issuing agents, the agent would normally send Chicago Title a copy of the prior policy or give Chicago Title information on it. The defendant states that if the agent neglected to do so, Chicago Title would nevertheless accept the refinance rate as given. The defendant also states that after Chicago Title merged with other title insurance companies, its title plant grew to include additional policies so some policy issuing agents had access to multiple companies' title plants. Consequently, Chicago Title would allow the refinance discount based on a prior policy issued by another title insurer if provided with proof of its existence.

## 2. Typical Transaction Where Chicago Title is Required to Charge the Refinance Rate

Chicago Title has three offices in Connecticut that apply uniform procedures for selling title insurance throughout the state. In residential transactions, other than direct writing handled through its national agency division, Chicago Title operates through title agents. Specifically, Chicago Title has a network of policy issuing agents and approved attorneys. Policy issuing agents generally prepare their own policies with little or no involvement from a Chicago Title office, whereas Chicago Title prepares the title policies for approved attorneys. As the principal, Chicago Title uses a standard agency agreement with policy issuing agents and approved attorneys, which generally has remained the same throughout the Class Period. Under the agreement, policy issuing agents and approved attorneys retain 60% of the title insurance premium and remit 40% of the premium to Chicago Title.

Chicago Title distributes to its agents a Connecticut Rate Manual or software that includes a rate calculator. The agents receive orders for title insurance from their customers (often lenders and brokers), perform or procure title searches, prepare and review title insurance commitments that identify any encumbrances, handle clearing of title, calculate and collect the premium charge for the title insurance, and send remittance reports to Chicago Title. The title search or title commitment reveals any encumbrances on the property, including the purchase transaction and the prior mortgage transaction of record that is being refinanced. This process allows Chicago Title and its agents to determine whether a particular borrower is entitled to the refinance rate. When Chicago Title procures the title search, it retains a copy of the title search or commitment. When it does not procure the title search, Chicago Title nonetheless may receive a copy of the title search. Agents are statutorily required to retain title search results for ten years. Moreover, regardless of who performed or procured the title search in a given Connecticut transaction, Chicago Title is contractually entitled to access the title search results, which contain all the information Chicago Title and its agents need to apply the refinance discount throughout the Class Period.

The plaintiff contends that Chicago Title failed to adequately monitor and instruct its agents as to when a borrower is entitled to the Connecticut refinance rate. She states that the agents received no organized training or education and that seminars provided by Chicago Title did not formally address this topic. The plaintiff also claims that Chicago Title did not include refinance rates in its audits of its agents and approved attorneys.

Chicago Title contends that it provided software, written updates and bulletins to inform agents and approved attorneys about the refinance rate, and fielded questions from agents and approved attorneys on a regular basis. It also contends that throughout the Class Period it double-checked premiums. For example, when it receives its portion of the premium from an issuing agent or approved attorney, the defendant checks for proper application of the refinance discount. If a full or nondiscounted rate is charged, Chicago Title looks for evidence that the transaction may have been a refinance. Chi-

cago Title will investigate further if that evidence appears in the file. If an overcharge occurred, Chicago Title sends a refund to the customer.

## C. Mahon's Transaction

In April 2002, Mahon purchased her home in Branford, Connecticut. She financed $170,000 of the purchase price with a mortgage loan from CTX Mortgage Company. Part of the transaction included the purchase of a lender's title insurance policy from First American Title Insurance Company, a Chicago Title competitor. A local attorney, Andrew J. Campbell, served as the closing agent and First American's title agent.

The refinancing at issue occurred on or about June 30, 2003, when Mahon purchased and paid for a Chicago Title title insurance policy. She refinanced her mortgage with a $220,000 mortgage loan from Northeast Mortgage Corporation. Joseph Biraglia, P.C. ("Biraglia"), a title agent for Chicago Title since the early 1990s, handled Mahon's refinancing. Biraglia issued a Chicago Title title insurance policy for the benefit of Northeast Mortgage Corporation.

Mahon's lender, Northeast Mortgage Corporation, contacted Biraglia to handle the closing, including the title-related aspects of the transaction. Mahon contends that Biraglia's general practice upon receiving such a request was to order a title search from Chicago Title. On or around June 17, 2003, Biraglia ordered a title search from Chicago Title for the Mahon refinancing. Mahon contends that following such a request, Chicago Title would return the title search results, the title commitment, the proposed policy to be used in connection with the transaction, and an invoice showing the amount due from the borrower for the policy and the amount due to Chicago Title. The defendant argues that because the prior title policy was

through First American and not Chicago Title, the new policy did not qualify for the refinance discount.[1] The defendant points out, by way of comparison, that Mahon did receive the discount in a subsequent refinancing[2] that Biraglia handled for her. The defendant also asserts that even if Chicago Title had been willing to give the discount based on competitors' title policies in June 2003, Mahon never produced a copy of the First American policy, though she acknowledges that she had a copy.

Subsequently, Chicago Title sent a title commitment to Biraglia for Mahon's transaction. Biraglia's practice was to review the title commitment, review the encumbrances on the property, and then send the title commitment to the lender. After that, Biraglia would resolve any title issue that appeared, or if none appeared, he would wait for the lender to instruct him that the file was ready for closing.

As part of the title package received from Chicago Title in the Mahon transaction,[3] Biraglia also received an invoice indicating that the amount to be charged for Mahon's title policy was the basic rate of $730 for a $209,000 loan policy, which was increased to $760 after the loan amount increased to $220,000.

This was the practice in the Biraglia–Chicago Title agency relationship, and Biraglia testified that it was his understanding, at all times beginning in 2000 (i.e., throughout the proposed Class Period), that he was not responsible for determining whether a refinance discount should be applied to a title policy premium (i.e., he leaves the task to Chicago Title).

Mahon contends that she should have received the refinance discount because there was an institutional mortgage within the then-applicable look-back period. She contends that Chicago Title overcharged her

1. First American's policies are not searchable through Chicago Title's title plant.

2. It is unclear from the record when this later refinancing occurred. *See* Def.'s Opp. at 12, Biraglia Dep. 60:12–61:15, App. 280–81.

3. To allow Chicago Title to calculate the amount of premium to be charged to the borrower for a

title policy, Biraglia's practice is to provide only the information on the title search order form, which, among other things, identifies whether the transaction is a purchase and sale or a refinance. This occurred in the Mahon transaction, in which the title search order form that Biraglia sent to Chicago Title clearly indicated that the transaction was a refinance.

$243.20 and that no one informed her of the availability of the refinance discount or how to receive it. Chicago Title contends that Mahon was required to produce a copy of a prior title policy to receive the refinance discount and that her previous mortgage could not serve as a proxy for the existing policy for the purpose of satisfying the requirement in the refinance rate manual.

Mahon contends that despite Chicago Title's mandatory rate language, neither Chicago Title nor its agent, Biraglia, took into account the institutional mortgage dated and recorded in April 2002, which is within the look-back period described in the refinance rate provision in the then-applicable Chicago Title Connecticut Rate Manual. The title commitment itself, prepared by Chicago Title and reviewed by Biraglia, reflects a mortgage deed dated April 11, 2002, in the amount of $170,000 to CTX Mortgage Company. Between Mahon's purchase and refinance of the property, title did not change from her name. Of the $760 title insurance premium Mahon paid, Biraglia retained 60% ($456) and remitted 40% ($304) to Chicago Title.

### D. Scope of the Title Insurance Coverage

During discovery, the plaintiff obtained and conducted a sampling of various Chicago Title agents' files relating to lenders' policies covering Connecticut real property issued during the Class Period. The plaintiff argues that many of Chicago Title's title agents, including its largest agents, had an exclusive or near-exclusive refinance practice (versus purchase and sales) in Connecticut and that these agents wrote substantially all of their policies at the basic rate while they wrote only a handful of polices at the refinance rate. The plaintiff maintains that the following samplings from files of Chicago Title's agents demonstrate the scope of the class:

1) **Equity National Title & Closing Services, Inc. ("Equity National"):** A sampling of 33 files relating to title policies issued in connection with refinancing transactions during the Class Period shows that 30 of those sampled policies were charged approximately the basic rate (or more than the basic rate) even though the borrowers were entitled to the refinance rate because the title commitments revealed institutional mortgages (within the ten-year look-back period, if applicable at the time of issuance).

2) **Closing USA:** Similarly, sampling from the files of Chicago Title agent Closing USA showed that 38 out of 38 policies from the period 2008 to 2009 reflected overcharges as a result of the failure to apply the refinance discount, instead charging the basic rate (or more).

3) **Linear Title & Escrow:** Sampling from the files of Chicago Title agent Linear Title & Escrow, specifically, title commitments issued in connection with refinance transactions, revealed that 21 out of 23 borrowers (all of whom were charged the basic rate for a Chicago Title lender's policy) should have received the refinance discount.

4) **Joseph Biraglia, P.C.:** Sampling from files in connection with refinance transactions revealed that 29 out of 32 borrowers should have received the refinance discount. Chicago Title's records show that Biraglia served as an agent in transactions involving 6,359 lender's policies from 2000 to 2009.

5) **Franco & Associates ("Franco"):** Sample of 12 title commitments from Franco issued in connection with refinance transactions revealed that out of the 12 borrowers (all whom were charged the basic rate), 12 should have received the refinance discount. Chicago Title's records show that Franco served as a Chicago Title agent in over 987 transactions from 2000 to 2005.

6) **RES/Title, Inc.:** The limited documents provided by RES/Title, Inc. revealed four instances of failure to give the refinance rate.

Chicago Title argues that the plaintiff's file sampling method produces unreliable results. Specifically, Chicago Title contends that out of its 868 title agents and approved agents in Connecticut from 2000 to the present, the

plaintiff selected files from six agents. In addition, out of the 117,048 transactions that are potentially at issue, the plaintiff chose 142 transactions. This sampling equates to 0.12% of the transactions and 0.69% of the agents and approved attorneys. Moreover, Chicago Title points out that for each of the 89 transactions that occurred before September 2006, the plaintiff assumes that a prior, qualifying title insurance policy existed and that enough was done to prove its existence at the time of the transaction.

## II. LEGAL STANDARD

The district court must determine through "rigorous analysis" that all Rule 23 requirements are met to certify the class. *In re Initial Public Offerings Sec.*, 471 F.3d 24, 40 (2d Cir.2006) (*"IPO"*). In *IPO*, the Second Circuit held that:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Id.* at 41. That a Rule 23 requirement overlaps with a merits issue does not prevent the court from making a determination as to whether the requirement has been met. See *id.* However, in assessing whether the requirements have been met, the court should not assess any aspects of the merits unrelated to a Rule 23 requirement. See *id.* (noting that the class certification proceeding should not turn "into a protracted mini-trial of substantial portions of the underlying litigation").

To be certified as a class, the class must satisfy the four prerequisites under Rule 23(a) and also fall within one of the categories in Rule 23(b). Under Rule 23(a), the prerequisites are (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims or defense of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy of the representation"). In *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), the Court stated:

> The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." In order to justify a departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements-numerosity, commonality, typicality, and adequate representation—"effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."

*Id.* at 2550 (internal citations omitted).

Upon satisfying the requirements of Rule 23(a), the plaintiff then must show that the class falls within one of the categories of cases described in Rule 23(b). *See In re Simon II Litig.*, 407 F.3d 125, 132–33 (2d Cir.2005). The plaintiff here seeks certification under Rule 23(b)(3): (i) "that questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) "that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Where all of the requirements under Rule 23(a) and 23(b) are met " 'the class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.' " *Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)) (alterations in original). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir.2010).

## III. DISCUSSION

The plaintiff claims that the defendant overcharged borrowers in their Connecticut refinance transactions throughout the Class Period. For the reasons discussed below, the court finds that the four prerequisites under Rule 23(a) and the Rule 23(b)(3) predominance and superiority requirements have been met with respect to the plaintiff's three claims against the defendant.

### A. Rule 23(a)

#### 1. Numerosity

■ The prerequisite stated in Rule 23(a)(1) is that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "Numerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995). The plaintiff argues the proposed class satisfies the requirement of numerosity because she has identified at least 123 borrowers. Specifically, the plaintiff asserts that the defendant overcharged Mahon, at least 30 borrowers identified through the Equity National sampling, at least 38 borrowers identified through the Closing USA sampling, at least 21 borrowers identified through the Linear Title sampling, at least 29 borrowers identified through the Biraglia sampling and at least four borrowers identified through the RES/Title sampling.

The defendant does not argue that the proposed class is not numerous but argues that the plaintiff's "cherry-picked samplings of five agent's files" results in a speculative class size. Def.'s Opp. at 40. The defendant also argues that there is nothing in the plaintiff's evidence that could support a finding that Mahon's sampling results can be applied beyond the selected agent's files. In addition, the defendant argues that the class definition is overbroad in that class size cannot be ascertained without conducting an extensive review of 117,048 real estate transactions, so the court cannot determine "quickly and easily, whether any given person is in or out of the class." *Id.* at 39. However, the court concludes that the class can be identified by objective criteria set forth in the proposed class definition.

■ In the instant matter, there are clearly more than 40 members and the class is ascertainable. Thus, the court finds that the prerequisite of numerosity is satisfied.

#### 2. Commonality

■ The prerequisite stated in Rule 23(a)(2) is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury.' " *Dukes*, 131 S.Ct. at 2551 (quoting *Falcon*, 457 U.S. at 157, 102 S.Ct. 2364). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* Rather, "[t]heir claims must depend upon a common contention.... That common contention, moreover, must be of a nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they turn on questions of law applicable in the same manner to each member of the class.' " *Falcon*, 457 U.S. at 155, 102 S.Ct. 2364. Determination of commonality requires a rigorous analysis that "[f]requently ... will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S.Ct. at 2551. Further-

more, "[t]o satisfy commonality, these common questions need not overshadow potential individual issues; common questions must simply exist." *Gale v. Chicago Title Ins. Co.,* 274 F.R.D. 361, 367 (D.Conn.2011) (quoting *Collins v. Olin Corp.,* 248 F.R.D. 95, 101 (D.Conn.2008)). Lastly, "minor factual differences will not preclude class certification if there is a common question of law." *Monaco v. Stone,* 187 F.R.D. 50, 61 (E.D.N.Y.1999).

 The plaintiff has established the existence of common questions of law or fact: whether the members of the proposed class were entitled to a discount rate under the defendant's statutorily filed premium rates manual and failed to receive that discount as a result of the defendant's wrongdoing. The plaintiff argues that either borrowers were charged and, in turn, paid the statutorily mandated premium rate, or they were not. Under what circumstances Chicago Title should have provided the refinance discount is a question that will not "vary from one putative class member to another." *Heerwagen v. Clear Channel Commc'ns,* 435 F.3d 219, 229 (2d Cir.2006).

The defendant, relying on *Dukes,* argues that there is no class-wide evidence to produce a common answer to the question as to which borrowers were overcharged. That question, the defendant contends, will vary from one putative class member to the next and can be answered only on a file-by-file basis.

The defendant's argument is unavailing. While a finding of commonality cannot rest on raising common questions alone as "[a]ny competently crafted class complaint literally raises common 'questions,'" *Dukes,* 131 S.Ct. at 2551, *Dukes* does not require the plaintiff to conclusively demonstrate the existence of common answers at the time of class certification. Rather, *Dukes* reiterates the principle that a common contention must exist whose eventual determination through a class-wide proceeding will resolve an issue central to the validity of each of the claims. The Court states in *Dukes* that its "opinion in *Falcon* describes how the commonality issue must be approached." *Id.,* at 2552–53. *Falcon* states that to bring a class action the lead plaintiff must make a "specific presentation identifying the questions of law or fact that were common to the claims of [the lead plaintiff] and of the members of the class he sought to represent." *Falcon,* 457 U.S. at 158, 102 S.Ct. 2364. Thus, *Falcon* requires the plaintiff to demonstrate the existence of common questions of law or fact to establish commonality, not demonstrate the existence of common answers.

Here, a common contention whose eventual determination through a class-wide proceeding will resolve an issue central to the validity of each of the claims is the proper interpretation of the language in Chicago Title's rate manuals during the Class Period.

The plaintiff contends that the presence of a prior institutional mortgage (within the ten-year look-back period under the 2000–2006 language and at any time under the current language) is sufficient to show entitlement to the refinance rate, provided that the premises are identical and there has been no disqualifying change in fee ownership (information that is also reflected in the title search). In support of that theory, the plaintiff argues that the 2006 amendment of the refinance rate provision in the rate manual functioned as a codification or clarification of the then-existing industry practice as it had developed over time. Pl.'s Mot. Class Cert. at 8; *see e.g., id.* Ex. WW, 6/6/2006 E-mail from J. Luksberg to J. Sullivan (asking, upon receiving a draft of the 2006 revision, "How is that different then [sic] what we currently do?"); Ex. ZZ, 1/10/08 Email from P. Fanning. As one of Chicago Title's agents explained, this practice reflects the fact that "[i]n order to make a loan saleable on the first mortgage market it has to carry title insurance. It's a Fannie Mae requirement." *Id.,* Ex. U, Firtel Dep. at 40:16–18; *see generally id.* at 4–6. Philip Fanning, Esq., the most senior Chicago Title employee with responsibility in Connecticut, stated that the amended refinance rate language "may simply be codifying the practice that has developed over time anyway." *Id.,* Ex. ZZ, 1/10/04 E-mail from P. Fanning. In describing the rationale for removing the look-back period, Jonathan Richards, Esq., Senior Vice President and Regional Counsel for Fidelity National Title Insurance Company, the par-

ent company of Chicago Title, stated that "we chose to remove the time limitation on the 1–4 family. Most mortgages are refinanced well within ten years. By eliminating the time limitation we eliminated another data point to deal with." *Id.,* Ex. CCC, Jane Sullivan Dep. at 75:8–13.

The defendant advances a different interpretation of the material provisions of the rate manuals. The defendant contends that Chicago Title required borrowers to produce proof of an existing title insurance policy previously issued by Chicago Title in order to qualify for the refinance discount in a residential transaction prior to 2006. Chicago Title states that giving a discount when the prior title policy was produced by Chicago Title reflects: 1) that Chicago Title would have received a premium already from the original transaction, and 2) that Chicago Title could confirm the existence of the prior policy in its title bank before the merger. In *Chesner v. Stewart Title Guar. Co.,* the court found that "this argument is a merits argument based on [the] [d]efendant's interpretation of the [rates] statute" and found the defendant's "interpretation of the rate statutes unpersuasive of the unfitness of this matter for class certification." No. 1:06–CV–00476, 2008 WL 553773, at *11 (N.D.Ohio, Jan. 23, 2008).

Based on the foregoing, the court concludes that plaintiff has met her burden by identifying questions of law or fact common to the class, including identifying a common contention the resolution of which is central to the validity of her claims. Therefore, the prerequisite of commonality is satisfied.

### 3. Typicality

■ The prerequisite stated in Rule 23(a)(3) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R.Civ.P. 23(a)(3).

Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.

*Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993); *see also Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001) ("Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."). Among the considerations are "whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 510 (S.D.N.Y.1996). Moreover, "the commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Gale,* 274 F.R.D. at 366 (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997)).

■ In its arguments addressing the commonality requirement, the defendant contends that the proposed class is defeated due to differences in agents and transactions. However, the claims arise out of the same course of events, the purchase of title insurance policies from Chicago Title in residential mortgage transactions, and the class members would make the same legal arguments, that she was overcharged under the statutorily filed premium rates by Chicago Title in violation of Connecticut law. Moreover, the defendant has the same relationship with each member of the putative class and must apply the proper rates under Connecticut law. Therefore, the court finds that the prerequisite of typicality is satisfied.

### 4. Adequate Representation

■ The prerequisite stated in Rule 23(a)(4) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "A

plaintiff can show that it adequately represents the interests of the class, pursuant to Rule 23(a)(4), if it appears that plaintiff's interests are not antagonistic to those of the class it seeks to represent and plaintiff's counsel is qualified to conduct the litigation." *Cordes & Co. Financial Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir.2007); *Macedonia Church v. Lancaster Hotel Ltd. P'ship*, 270 F.R.D. 107, 118 (D.Conn.2010) (quoting *In re Flight Safety Tech., Inc. Sec. Litig.*, 231 F.R.D. 124, 128 (D.Conn.2005)). The defendant does not object to the conduct and participation of the plaintiff's counsel in this matter, and the court finds that such counsel's work meets the applicable standard. The defendant also does not dispute that Mahon is an adequate class representative.

Rule 23(a)(4) is satisfied in this case as Mahon's interest is not antagonistic to the class and counsel are experienced consumer class action attorneys. Specifically, Mahon's interests are aligned with those of putative class members, and she has demonstrated her commitment to these interests by agreeing to serve as the class representative, retaining experienced counsel and participating in class discovery. Thus, the court finds that the prerequisite of adequate representation is satisfied.

### B. Rule 23(b)(3)

In addition to satisfying the prerequisites of Rule 23(a), the proposed class action must also be "maintainable" under one of the three categories found in Rule 23(b)(1)-(3). *In re Simon*, 407 F.3d at 132–33. The plaintiff has sought to certify the class under Rule 23(b)(3).

A Rule 23(b)(3) class action may be certified if the court finds that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

The requirement's purpose is to "ensure[ ] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" Therefore the requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."

*Myers*, 624 F.3d at 547 (internal citations omitted) (alterations in original). As set forth below, the proposed class is appropriate for certification under Rule 23(b)(3).

### 1. Predominance

"Courts often consider the requirements of Rule 23(a)(2) [for commonality] in conjunction with Rule 23(b)(3) [for predominance]." *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 180 (S.D.N.Y.2005). However, the predominance requirement "is a more demanding criterion than the commonality inquiry under Rule 23(a)." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). To satisfy predominance under Rule 23(b)(3), "a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001), *overruled on other grounds by In re IPO*, 471 F.3d 24 (2d Cir.2006), and *superseded by statute on other grounds as stated in Attenborough v. Const. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 100 (S.D.N.Y.2006). In particular, courts should "focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual ones." *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y.1981); *see also Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 267 (D.Conn.2002) ("[W]hether [the insurer] acted improperly in classifying the plaintiffs is the common liability issue that predomi-

nates over all other factual and legal issues.").

The court finds that the question that predominates, with respect to each of the plaintiff's claims, over any questions affecting only individual members, is whether the presence of a prior institutional mortgage (within the applicable look-back period under the 200–2006 language and at any time under the current language) was sufficient to entitle a Connecticut borrower to Chicago Title's refinance discount. The class definition provides objective criteria for determination.

The defendant makes several arguments as to why the plaintiff has not shown that common issues would predominate in this case. Def.'s Opp. at 16–33. The court finds the defendant's arguments unpersuasive because they are premised on a misreading of the plaintiff's theory of the case, substituting for the plaintiff's theory of liability with one formulated by the defendant, namely that the purchaser of a title insurance policy was entitled to the discount if the purchaser had prior title insurance during the look-back period.

First, Chicago Title argues that "identifying overcharges requires a file-by-file review." *Id.* at 17. However, in evaluating the same argument, one district court noted:

> Even if it takes a substantial amount of time to review files and determine who is eligible for the discount, that work can be done during discovery. Plaintiffs can then identify the individuals who are eligible for the discounts and did not receive them. If the jury agrees that such individuals are entitled to a recovery ... then proof of class membership would be relatively easy. In short, while this issue may involve a file-by-file review, it will not require a file-by-file trial.

*Perez v. First Am. Title Ins. Co.*, No. 08–CV–1184, 2009 WL 2486003, at *7 (D.Ariz. Aug. 12, 2009).

Second, Chicago Title contends that it would need to develop a process to determine overcharges. *See, e.g.,* Def.'s Opp. at 20 (evaluative review would require, *inter alia,* contacting "the prior lender, the prior attorney, or asking the borrower for documents that could track down the policy"). But this purported problem is premised on Chicago Title's misreading of the plaintiff's theory of liability.

Third, the defendant argues that the plaintiff improperly seeks to use the institutional first mortgage as a proxy and evidentiary short-cut for the requirement of an existing title insurance policy and also seeks a class-wide presumption that each class member's institutional first mortgage was insured, preventing the defendant from rebutting the presumed existence of a prior title insurance policy for any individual transaction. However, what the plaintiff is contending is that a prior institutional first mortgage is not an evidentiary proxy but rather that a prior institutional first mortgage in the look-back period was sufficient to satisfy the "existing policy" requirement in the 2001 rate manual and to entitle a borrower to the refinance discount. *See, e.g.,* Pl.'s Mem., Ex. U, Firtel Dep. at 51:5–11. Thus, under the plaintiff's theory of liability, it would not be necessary, *inter alia,* to "obtain[ ] proof of a prior policy...." Def.'s Opp. at 20. At any rate, "even if there are some individualized damage issues, common issues may predominate when liability can be determined on a class-wide basis." *Macedonia Church v. Lancaster Hotel, L.P.,* 270 F.R.D. 107, 117 (D.Conn. 2010) (internal quotation marks and citation omitted).

Fourth, based upon a misreading of the plaintiff's theory of liability, Chicago Title advances two affirmative defenses with respect to borrowers who searched for but could not locate a prior policy. *See* Def.'s Opp. at 25 ("Any curtailed search would arguably demand individualized testimony to figure out if a defense of waiver or estoppel applied."). Again, however, the plaintiff maintains that a borrower with a prior institutional first mortgage within the applicable look-back period should have received the refinance discount irrespective of whether he or she could find the prior policy.

Fifth, Chicago Title argues that "[b]ecause some agents informed consumers of the discount and took steps to obtain it, equitable considerations would vary by transaction." Def.'s Opp. at 26. "In logical terms, howev-

er, it is not plausible to think that a consumer, made aware of the opportunity to save hundreds of dollars, would choose to pay the higher rate and forego a savings mandated by law." *In re Coordinated Title Ins. Cases,* No. 010764/2002, 2 Misc.3d 1007(A), 2004 WL 690380, at *9 (N.Y.Sup.Ct. Jan. 8, 2004).

Sixth, Chicago Title criticizes the plaintiff's sampling of its agents' files, which the plaintiff used to demonstrate the pervasiveness and ease of proving overcharges. *See* Def.'s Opp. 26–28. For example, Chicago Title asserts that the plaintiff improperly "assumed that a prior, qualifying title insurance policy existed...." *Id.* at 13. However, this argument again ignores the plaintiff's contention that every borrower with a prior institutional first mortgage within the look-back period qualified for the refinance discount in the first place. Chicago Title obtained "divergent results" because it replaced the plaintiff's theory of liability with its own litigation position and applied different criteria in doing the analysis. *See id.* at 14 ("Applying *the proper review criteria,* Chicago Title found only one instance of not giving the refinance discount where required." (emphasis added)).

Seventh, Chicago Title concedes that, contrary to the rule that rate filings must be applied uniformly, "[s]ome agents took a very strict approach and applied the discount only when they had actual knowledge of a prior title insurance policy having been issued" while "[o]thers favored borrowers through very lenient practices." *Id.* at 28–29 (internal quotation marks omitted). Chicago Title asserts that this lack of uniformity "exacerbate[s] the absence of common, predominating issues," on the ground that "[the] [p]laintiff's argument demands that the discount be given to class members who may not qualify for it, simply because some agents previously adopted consumer-friendly practices." *Id.* at 30. To the contrary, the plaintiff maintains that every borrower with a prior institutional first mortgage within the look back-period necessarily qualified for the refinance discount.

Class certification is appropriate given the standardized nature of the title insurance transactions at issue and the claims being brought by the plaintiff. The statutorily filed premium rates must be applied uniformly. In each transaction, (i) the putative class member paid the premium charged/collected by Chicago Title and/or its agents in exchange for a title insurance policy; (ii) Chicago Title was required by law to charge a premium in accordance with its filed rates; (iii) the putative class member paid the premium charged by Chicago Title, which was an overcharge; and (iv) the putative class member was damaged by being overcharged for the title insurance. *See Dubin v. Sec. Union Title Ins. Co.,* 162 Ohio App.3d 97, 832 N.E.2d 815, 820–21 (2005). The claims being brought by the plaintiff present the following common issues of law and fact:

—Whether Chicago Title was unjustly enriched by collecting premiums in excess of the filed rates;

—Whether Chicago Title, by failing to charge its statutorily mandated rates to borrowers, breached implied contracts with members of the class; and

—Whether Chicago Title is liable for "money had and received."

The defendant contends that none of the plaintiff's claims in the First Amended Complaint is amenable to class-wide proof.

 The defendant contends that the plaintiff's unjust enrichment claim involves the examination of the individual file and factual circumstances for every real estate transaction. To recover for unjust enrichment under Connecticut law, the plaintiff must show: "(1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 283, 649 A.2d 518 (1994); *accord Vertex, Inc. v. City of Waterbury,* 278 Conn. 557, 574, 898 A.2d 178 (2006). Unjust enrichment is precisely the sort of claim that class actions were designed to address. *See, e.g., Campbell v. First Am. Title Ins. Co.,* 269 F.R.D. 68, 73 (D.Me.2010); *Lewis v. First Am. Title Ins. Co.,* 265 F.R.D. 536, 543 (D.Idaho 2010); *Mims v. Stewart Title Guar. Co.,* 254 F.R.D. 482, 484 (N.D.Tex.2008), *rev'd in part on other grounds,* 590 F.3d 298,

307–08 (5th Cir.2009); *Alberton v. Commonwealth Land Title Ins. Co.,* 247 F.R.D. 469, 475 (E.D.Pa.2008); *Markocki v. Old Republic Nat'l Title Ins. Co.,* 254 F.R.D. 242, 246 (E.D.Pa.2008); *Cohen v. Chicago Title Ins. Co.,* 242 F.R.D. 295, 297 (E.D.Pa.2007).

Under this theory, the plaintiff contends that Chicago Title has been unjustly enriched by its receipt of inflated title insurance premiums, because Chicago Title was not entitled to them by law. The facts and law supporting the claim of improper charges are the same regardless of the individualized circumstances. Accordingly, the court finds class certification of the plaintiff's unjust enrichment claim is appropriate based on the plaintiff's theory of liability.

■■■■ The defendant contends that the plaintiff's implied contract claim is not appropriate for class certification because inquiry into individual facts is required. Connecticut courts recognize this cause of action. *See, e.g., Janusauskas v. Fichman,* 264 Conn. 796, 804–05, 826 A.2d 1066 (2003). "An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties." *Vertex,* 278 Conn. at 573–74, 898 A.2d 178 (citing *Janusauskas,* 264 Conn. at 804, 826 A.2d 1066). The elements of a breach of contract or implied contract claim are: "(1) formation of an agreement; (2) performance by one party; (3) breach of the agreement; and (4) damages." *Maloney v. Connecticut Orthopedics, P.C.,* 47 F.Supp.2d 244, 249 (D.Conn.1999).

Here, the implied contract required that Chicago Title issue a title insurance policy in accordance with the applicable rate manual on file with the Connecticut Insurance Commissioner. The borrowers promised to provide the funds for the title insurance premium, and Chicago Title promised, in expectation of those funds, to issue a title policy. The plaintiff argues that the defendant breached the agreement by not complying with the 2001 Connecticut Rate Manual on file with the Connecticut Insurance Commissioner, resulting in overcharges to the borrowers.

The court concludes that certification of the breach of implied contract claim is appro-priate because the claim turns on the standardized nature of the title insurance transaction and the statutorily filed premium rates, not on the facts and circumstances unique to any particular class member.

With respect to the claim for money had and received, the plaintiff contends that Chicago Title wrongfully charged Mahon and the putative members of the class monies by charging, collecting and retaining title insurance premiums in excess of the filed rates, that Mahon and the putative members of the class paid the inflated title premiums to Chicago Title inadvertently and by mistake, and that they were free from any moral or legal obligation to make such payments. Class treatment of this action is appropriate given the standardized nature of the statutorily filed premium rates. Individual circumstances are not relevant. *See Alberton,* 247 F.R.D. at 480, 482–83 (granting class certification on, *inter alia,* money had and received claim); *Cohen,* 242 F.R.D. at 297, 302 (same); *Markocki,* 254 F.R.D. at 246, 251. Therefore, the court concludes that class certification as to the money had and received claim is appropriate.

**2. Superiority**

■■■■ In assessing whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy, Rule 23(b)(3) instructs that the matters pertinent to this inquiry include the following factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3); *see also In re Nassau County Strip Search Cases,* 461 F.3d 219, 230 (2d Cir.2006). A class action is superior where "class-wide litigation of common issues will reduce litigation costs and promote [judicial] efficiency." *Collins,* 248 F.R.D. at 106 (citation omitted). Moreover, class action is

appropriate where "each potential plaintiff's claim amounts to but a few hundred dollars, at most" because "it is unthinkable that a potential plaintiff would have the resources or the desire to employ such resources in adjudicating individual claims." *Mitchell–Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 560 (D.Md.2006).

■ As to the first factor, in light of the legal and factual issues common to the class members, individual litigation of these consumer claims would not be in the interests of justice and would make little practical sense. The plaintiff highlights individual members of the class have a limited to no ability to litigate their claims against Chicago Title in separate lawsuits because individual damages are unlikely to exceed a few hundred dollars. As to the second factor, the plaintiff states that to her knowledge, there are no other pending cases in Connecticut alleging that Chicago Title overcharged its customers for title insurance by failing to charge the legally mandated filed rates. As to the third factor, the court agrees that the concentration of litigation in this forum is desirable because it would serve the interests of judicial economy and conserve the parties' resources. As to the fourth factor, the case will be manageable as a class action because all of the class members reside in Connecticut, the calculation of damages would be based on objective criteria and uniform application of the filed rates, Chicago Title has access to the borrowers' files, and the alleged course of action by the defendant took place in Connecticut. Thus, the plaintiff satisfies the superiority requirement for Rule 12(b)(3).

The defendant argues that two factors render class relief inferior: the unmanageability of the proposed class and the availability of administrative remedies. First, the defendant contends that managing the class would impose extraordinary administrative burdens, including contacting agents and reviewing, indexing and storing files, for the defendant as it identifies the class members and/or calculates damages. By way of example, the defendant states that its review of 142 files "consumed 156 person-hours over the course of nine weeks" and involved loan files with "17,349 separate pieces of paper, with an average of 122 pages per file." Def.'s Opp. at 36.

However, the burden and cost of litigation placed on the defendant would be the same in the aggregate if class members were to proceed with the alternative approach of filing individual lawsuits. In fact, "Rule 23 is designed to spare parties and the court the cost of that sort of duplicative litigation." *Held v. AAA S. New England,* No. 3:11cv105, 2012 WL 4023367, at *1 (D.Conn. Sept. 12, 2012). Moreover, damages calculation will present no obstacle because "[it] is a straightforward mathematical calculation based on the difference between the rate potential class members received and the filed reissue rate,' the rate that the class members allegedly should have received," all of which is based on the same uniform application of the filed rates. *Mitchell–Tracey,* 237 F.R.D. at 557 (rejecting title insurer's argument that variable damage awards rendered overcharge case improper for class certification); *see also Newberg on Class Actions* § 3.16 ("If differences in amounts of individual damages would make a class action improper, a class action for damages would never be possible....").

■ Second, the defendant contends that the Connecticut Department of Insurance's Division of Consumer Affairs provides the superior forum for resolving the claims here. The defendant points out that the division must "receive and review complaints from residents of [Connecticut] concerning their insurance problems[.]" Conn. Gen.Stat. § 38a–9(a). However, despite filing motions to dismiss and other affirmative defenses in its answer, Chicago Title has never asserted, and has therefore waived, this exhaustion defense. Moreover, the defendant relies on *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205 (9th Cir.1975) and *Arthur v. Ticor Title Ins. Co. of Fla.*, 569 F.3d 154 (4th Cir.2009) for the proposition that the Department of Insurance provides a superior means of adjudicating these claims. But in *Kamm,* California's attorney general and real estate commissioner, in a separate state court action, already had reached a settlement with the defendants that provided restitution for many members of the putative class. 509

F.2d at 207–08, 212. The administrative remedy was another lawsuit, and it was superior because significant relief had already been obtained. *See id.* In *Arthur,* the issue was jurisdictional, namely whether the plaintiff was required to exhaust an administrative remedy. 569 F.3d at 161. Thus, the court finds this argument unpersuasive.

## C. Appointment of Counsel

Pursuant to Rule 23, "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." Fed. R.Civ.P. 23(g)(1)(A). Rule 23(g) sets forth several factors the court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed.R.Civ.P. 23(g)(1)(A)(i)-(iv). Moreover, "[i]n appointing class counsel, the court may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(g)(1)(B).

Motley Rice LLC, the proposed class counsel, has experience and expertise in class actions as well as other complex litigation. It has performed extensive work in this case as demonstrated by taking discovery, briefing legal issues and defending against the defendant's motion to dismiss.

Therefore, the court appoints Motley Rice LLC as class counsel.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Class Certification Directed to Defendant Chicago Title Insurance Company (Doc. No. 92) is hereby GRANTED.

It is so ordered.